James K. WOLOSOFF, on behalf of himself and all of the stockholders of Cable Systems Incorporated, and James K. Wolosoff, Individually, Plaintiffs,

v.

CABLE SYSTEMS INCORPORATED, Audubon Electronics, Inc., Irving B. Kahn, Thomas B. Troehler, Milton H. Hendler, Morty Wolosoff, Gloria Wolosoff, and Jerry Hastings, Defendants.

Civ. No. 80–3388.

United States District Court,
D. New Jersey.

April 2, 1981.

Greenbaum, Greenbaum, Rowe & Smith by Dennis A. Estis, Woodbridge, N.J., for plaintiffs.

Smith, Stratton, Wise & Heher by Allen N. Grossman, Princeton, N.J., for defendants; Golden, Wienshienk & Mandel, New York City, of counsel.

OPINION *

BIUNNO, District Judge.

This is a diversity suit between citizens of different states, in which this court sits as though it were the Superior Court of New Jersey. It is filed by a minority shareholder (25%) and director of a closely held New Jersey corporation, Cable Systems, Incorporated (CSI) on behalf of himself and all shareholders of the company, and individually. The complaint is in 16 counts. The first 15 counts assert claims on a variety of theories arising out of a contract entered into between CSI and The New York Times Company, assigned by the latter to a subsidiary (TIMES) for a sale of the assets of CSI in consideration of an agreed purchase price plus assumption of liabilities other than certain specified ones. The 16th count

* An earlier memorandum and order follow as an   Appendix.

is for declaratory judgment to ascertain the rights, status and legal relations as between CSI and plaintiff, N.J.S. 2A:16–50 to 62, in respect to the statutory right of dissent, appraisal and payment established by N.J.S. 14A:11–1 to 11 (General Corporation Law).

CSI is a "cable television" enterprise (CATV) and as such it is a regulated company under N.J.P.L.1972, c. 186; N.J.S.A. 48:5A–1 to 53 (pocket part). Regulation is at a two-tier level. State level regulation is placed in the Office of Cable Television in the Department of Public Utilities, N.J.S.A. 48:5A–4, and enterprises which operate, own or control CATV activities must first obtain a certificate of approval, N.J.S.A. 48:5A–15.

As is well known, general TV broadcast, like radio, involves the transmission of signals from originating to receiving antennas. The frequency spectrum assigned by the FCC for this purpose is at "ultra high frequency" (UHF) and at "very high frequency" (VHF), these being simple labels to indicate the extremely short wavelengths of the carrier frequencies used for broadcast. Thus, Channels 2 through 6 are each assigned a 6 megacycle band from 54 megacycles to 88 megacycles, while Channels 7 through 13 are each assigned a similar band from 174 megacycles to 216 megacycles. The FM broadcast band, and other broadcast services, occupy the spectrum between Channels 6 and 7 (88 to 174 megacycles). The UHF Channels 14 through 83, are considerably higher.

It is characteristic of these high frequency signals that unlike the familiar radio broadcast signals, they cannot be reliably transmitted over great distances. The common radio signals are broadcast at frequencies in the range of 500 kilocycles to about 1600 kilocycles, and by reflection between the Kennelly-Heaviside layer of the ionosphere and the earth's surface, over and over, travel for great distances. See Henney, Radio Engineering Handbook, McGraw-Hill (Third Ed., 1941), p. 518, et seq. The short wavelengths of TV broadcast signals are not reflected but pass through the ionosphere, and so acceptable reception is limited to "line of sight" distances between the broadcast and receiving antennas, measured at best by the geometry of the curvature of the earth and intervening obstructions.

Since the use of adjacent bands in a broadcast area is certain to cause interference, the FCC has assigned alternating band frequencies to the stations. Thus, for the New York metropolitan area, the channels are 2, 4, 5, 7, 9, 11 and 13. Four megacycles separate Channels 4 and 5, while 86 megacycles separate Channels 6 and 7. The others are all adjacent bands. Similar considerations apply to Channels 14 to 83.

Even so, distance, intervening hills and other topography attenuate the signal in a given broadcast area. Weak signals result (the familiar "snow" in the picture), and reception is more subject to stray interference from passing automobiles, power lines, CB radios and the like.

CATV systems came into use originally as a method for providing high quality reception to locations subject to one or another such disadvantage. Master antennas, placed to receive strong signals relatively free of interference, along with repeater amplifiers, distribute the signals by means of coaxial cable or equivalent means (including microwave transmission) to subscribers.

Later on, methods were devised to broadcast additional programs (which may be videotape or "live" material) over unused channels, often sent out over different frequency bands but converted to the unused channels by means of the well-known superheterodyne system or the like.

When cable is used for distribution, the necessary poles, conduits and cables must be physically put in place. State approval allows this to be done on, under or over highways, NJSA 48:5A–20; and facilities or rights of way of others (e.g. electric companies and telephone companies) may be leased or rented with the approval of the State board, NJSA 48:5A–21.

Where the facilities are to be placed in, along, beneath or over highways and other public places, there must be a municipal consent to the operation itself, granted by resolution, NJSA 48:5A–22, followed by an ordinance after hearing, NJSA 48:5A–23 and 24, for a term which may be as long as 15 years, and may provide for renewal for as long as 10 more years, NJSA 48:5A–25, subject to the payment of annual franchise fees, NJSA 48:5A–30.

CSI was incorporated December 10, 1973 in New Jersey (See certificate in Minute Book, Exh. C–1). Troehler subscribed to 90 shares, and Hastings to 10 shares, but no stock was issued until after an agreement was made between them and Morty Wolosoff (plaintiff's uncle) under date of October 7, 1975.

By that agreement (Exh. C–19A)

... Troehler assigned to Wolosoff subscription rights to 50 shares;

... Troehler assigned to Hendler subscription rights to 30 shares;

... Each share was to be issued for $1,000;

... The Board was to consist of 4 directors;

... Each stockholder agreed to vote for Wolosoff and a nominee of his, as two directors;

... Each stockholder agreed to vote for Hendler and a nominee of Hendler, as the other two directors;

... Wolosoff was to be Chairman of the Board and Secretary;

... Hendler was to be the Treasurer;

... No salary was to be paid to the parties for personal services to the corporation, except for accounting services by Hendler, but the restriction does not apply to compensation of Cable View Corporation under its consulting agreement (Exh. C–15) for services rendered through Troehler;

... No borrowings, and no checks for more than $1,000 were to be made without prior approval of the Board;

... All checks and notes were to be co-signed by the President, and by either the Chairman of the Board or the Treasurer;

... Neither Troehler nor Hastings was to pledge, mortgage, option or otherwise encumber his shares, or transfer his shares, without consent of the parties unless the proposed transferor first tendered them to the others (on stated terms) and the tender was not accepted;

... Wolosoff and Hendler each were entitled to buy up to 50% of all the stock of Troehler or Hastings on such a tender, and if either Wolosoff or Hendler elected not to purchase any shares so available, the other could purchase them, but if by such purchase, or by a purchase in the event of the death of Troehler or Hastings (under par. 6), it was the intent that Wolosoff have voting rights limited to 50% of all shares, and for any excess he acquired, Hendler (or his nominee) was to be given an irrevocable proxy for the voting rights only of such excess shares;

... If the tender were not accepted in whole, then the tendering shareholder was free to make a bona fide sale to the designated third-party purchaser, but the stock so sold was to remain subject to all the terms and conditions of the Agreement.

... Provisions were also included to acquire the stock of Troehler or Hastings in the event of the death of either, essentially along the same lines as on a tender based on a bona fide offer to purchase by a third party, except that to the extent Wolosoff or Hendler did not purchase, then the corporation was obliged to do so, all at a price defined as nine times the average cash flow of the corporation during the preceding three years, divided by the number of outstanding shares at purchase. Cash flow was defined as net income after taxes, plus depreciation and plus salaries to officers, as shown on the corporate income tax returns;

... Every certificate of stock was to bear a legend giving notice of the Agreement.

... At the time, CSI had 15 year franchises for Audubon, Audubon Park and Oaklyn, N.J., and intended to apply for others; both Troehler and Hastings agreed that during the original or renewal period of any CSI franchise, neither would compete with CSI in the acquisition of franchises in a list of municipalities nor in any CATV systems immediately contiguous thereto;

... The four shareholders agreed to lend CSI $200,000 in proportion to their share holdings; and Wolosoff agreed to lend Hendler and Hastings the funds for their loans to CSI, with the stock of Hendler, Hastings and Troehler being pledged as security therefor and deposited with a named escrow agent;

... If CSI needed additional funds for construction in franchise areas and cannot make other suitable financial arrangements, each shareholder is to contribute in proportion to his shareholdings, but if Troehler or Hastings need additional loans, they are to be made by Hendler and Wolosoff in the ratio of one to five;

... The parties elected that CSI be treated as an 1120–S corporation, and to continue that election from year to year at Wolosoff's sole discretion, and to provide for a custodian, in any inter vivos or testamentary document, authorized to continue that status and election;

... Hastings owed CSI $10,000 for his stock subscription and Wolosoff agreed to lend him the funds for that purpose;

... The Agreement was to remain in effect for 20 years;

... If Wolosoff and Hendler agree to sell their combined 80% interest in CSI to a third party, Troehler and Hastings are required to sell their combined 20% interest to the same purchaser, and Wolosoff and Hendler are required to include that 20% in the sales arrangements on the same terms and conditions that govern them.

The entries in the stock book and in the stock transfer book show that Wolosoff was issued certificate No. 3 on January 8, 1976 as "original issue" of 50 shares (Exh. C–2 and C–3).

On July 28, 1976, Wolosoff transferred 20 of his shares to his wife Gloria, and certificate No. 5 was issued to her on that day, while certificate No. 6 was issued to Wolosoff for his remaining 30 shares.

On July 18, 1977, Wolosoff transferred 25 of his remaining shares to his nephew James K. Wolosoff, the plaintiff here, and certificate No. 7 was issued to him, while certificate No. 8 was issued to Wolosoff for his remaining 5 shares.

On December 20, 1979, Hendler transferred 20 shares of his original 30 to Irving B. Kahn, leaving him with 10 shares for which certificate No. 10 was issued the same day.

Thus, at the time the proposed sale of CSI assets to the Times came up for action by the Board and the shareholders, and at the time this suit began, the share holdings remained at 50% each for the interests party to the 1975 Agreement, as follows:

Wolosoff interests

| | | |
|---|---|---|
| Morty Wolosoff, | 5 shares | |
| Gloria Wolosoff, | 20 shares | |
| James K. Wolosoff, | 25 shares | |
| Total | | 50 shares |

Other interests

| | | |
|---|---|---|
| Thomas B. Troehler | 10 shares | |
| Milton Hendler | 10 shares | |
| Jerry Hastings | 10 shares | |
| Irving B. Kahn | 20 shares | |
| Total | | 50 shares |
| Grand total | | 100 shares |

Also, the corporate minute book discloses that from the original issuance of stock to this day, the Wolosoff interests have been represented by two directors on the Board, and the other interests by two directors on the Board, and that the total number of directors is four. This is as was intended and provided by the 1975 Agreement.

Mr. Kahn, who had been a pioneer in the field of CATV, had formed his own separate CATV company, Audubon Electronics, Inc. (AEI) and was its sole owner. He also owned and operated Cable View Corporation (CVC) engaged in the business of providing consulting and management services

to CSI.[1] As of the making of the 1975 Agreement, the existence of CVC and its services to CSI were known to all CSI interests, as was the fact that Troehler rendered some of CVC's services. It is expressly mentioned in par. 3 (Exh. C–19A).

At some time before July 24, 1980 it became known that the Times was interested in acquiring the assets of both CSI and AEI for use by its own CATV subsidiary or division.

Although there is no formal resolution by the CSI board, or other formal document for the purpose, CSI had Mr. Kahn conduct the negotiations with the Times for both CSI and AEI.[2] Out of these negotiations, which took place over a number of months, five basic documents ensued as follows:

1. A "Purchase Agreement", Exh. C–4, by which the Times undertook to buy and CSI agreed to sell, substantially all the assets of CSI, dated July 24, 1980; this was assigned by the Times to its subsidiary or division on August 1, 1980, Exh. C–9;

2. A supplemental letter agreement between the Times and CSI, also dated July 24, 1980, Exh. C–5;

3. A supplemental letter agreement from all the shareholders of CSI except plaintiff, to the Times, dated July 24, 1980, Exh. C–6;

4. A consulting agreement, Exh. C–11 between the Times and Mr. Kahn for the latter to provide the Times with consulting services for a period of 6 years, and an agreement by Mr. Kahn not to compete, for the same period;

5. A purchase agreement (not an exhibit here but referred to in other documents) for the purchase by the Times of AEI's assets.

No question is raised in respect to CSI's compliance with specified statutory procedures in Title 14A for the sale of assets, and the documentation is found in the minute book, Exh. C–1. Nor is any question raised in respect to securing approval for the sale as required by Title 48, and the order of the Board of Public Utilities dated November 7, 1980 approving the sale and the transfer of certificates in B.P.U. Docket No. 8010C–6772, is Exh. C–10.

The first formal meeting of the CSI board to consider whether to recommend to the shareholders that the proposed contract be entered into was evidently scheduled for July 19, 1980, and notice of it was given July 11, 1980, see Exh. C–12, pages 1–4.

The minutes show that plaintiff attended that meeting, although no action was taken other than discussion of the proposed sale, and the meeting was adjourned to July 23, 1980.

On July 22, 1980, plaintiff sent a mailgram to Philip Mandel, Esq., of the New York law firm participating in the matter, in which he "vehemently" objected to the Times transaction, as well as to the related transactions of the Times with AEI and Kahn, and "vigorously" insisted that the transaction not be undertaken. See Exh. C–12, p. 5.

The CSI board met again on July 23, 1980; plaintiff, although a director, did not attend. No board action was taken at this meeting, and it was further adjourned to July 24, 1980. Notice of this adjournment was given to plaintiff by CSI's president, Troehler, by mailgram, see Exh. C–12, p. 6.

On July 24, 1980, plaintiff did not attend the board meeting but instead sent a telegram to CSI's president on that date, stating that the sale transaction, together with the AEI contract and the Kahn consulting and non-competition contract were "totally unacceptable". He charged that the AEI and Kahn contracts were intended to benefit Kahn's interests to the detriment of plaintiff and CSI. He charged that "the subterfuge of assets" compounded the "inappropriate and improper undertaking" and asked immediate termination of the Times

1. The agreement is non-exclusive, allowing CVC to render like services to other CATV enterprises. Compensation is partly on a retainer basis and partly on a profit-sharing basis.

2. Without deciding the point, this service for CSI may fall within the consulting agreement with CVC.

negotiations and rejection of such proposals "forthwith". In the alternative he said he would exercise his rights to insure the preservation of his rights and assets. See Exh. C–12, p. 7.

At the adjourned meeting of July 24, 1980, the 3 members of the CSI board present voted to authorize the Times contract and to recommend it for approval by the shareholders for which purpose a special meeting of shareholders was called for August 19, 1980. Notice of this meeting was given to plaintiff on July 25, 1980 by Morty Wolosoff, as Secretary of CSI. The notice included a summary of the rights of dissenting shareholders and the text of NJSA 14A:11–1 through 10 as well as a summary of the Times contract. The notice was accompanied by a copy of the Times agreement and Exhibits, and the supplemental letter of the same date. See Exh. C–12, pp. 8–20. Two separate packages of these papers were sent to plaintiff, one to an address in Clark, N.J. and the other to his office. See Exh. C–12, p. 21. There is no claim he did not receive them.

The other six shareholders signed a waiver of notice of the shareholders meeting; this waiver was signed July 24, 1980, the same date the board acted and the day the agreement and supplemental letter were signed. See Exh. C–12, p. 22.

On August 13, 1980, plaintiff sent a letter to CSI as "formal Notice of Dissent" under New Jersey statutes including but not limited to NJSA 14A:11–1, et seq. He expressed objection and requested that the sale not be undertaken because it was not in the best interest of CSI and because it did not reflect fair value of the stock. He also expressed the belief that the sale was not negotiated in good faith to benefit all shareholders but was a unique preference given to AEI and Kahn at the cost and expense of CSI and his stock holding. He asked to be notified if the transaction were concluded and said he intended to demand payment for his shares if the sale closed. See Exh. C–12, p. 23.

The minutes reflect that at the shareholders' meeting of August 19, 1980, the other six shareholders, representing 75% of the total stock, all approved the sale, Exh. C–1.

On August 27, 1980, plaintiff wrote again to CSI asking for confirmation of the action taken at the meeting of August 19th, and, if the shareholders voted to consummate the sale, demanded his "rights of fair value" for his shares under the statute. See Exh. C–12, p. 24.

Plaintiff also seems to have written to the N.J. Office of Cable Television, to which its deputy director replied by letter of August 29, 1980 advising that no petition for approval of the sale had been filed; and that if it were, plaintiff's dissent and any reply thereto would be considered in any action taken. See Exh. C–12, p. 25.

By letter of September 4, 1980, New York counsel wrote plaintiff and reported the approval of the sale at the meeting of August 19, 1980 by unanimous vote of all shareholders attending. See Exh. C–12, p. 26.

The Times contract, with its annexes and exhibits, is a massive document, typical of a transaction for the sale of assets of a going business. Of importance here are provisions, by way of conditions to closing. (Exh. C–4, Section 11, p. 60) that on the closing date

   . . . there be no action pending wherein an unfavorable judgment would prevent carrying out the Agreement, declare the transactions contemplated to be unlawful, or cause them to be rescinded, or require either party to divest itself of any asset or property;

   . . . the consulting agreement with Kahn is to be in full force and effect;

   . . . the closing with AEI shall have been completed or shall have occurred simultaneously.

These provisions, as well as other references in the contract, openly disclose the Times requirement that it obtain the assets of both CSI and AEI under the purchase agreements, and the services plus non-competition agreement of Kahn. The situation is not unlike that of an interested purchaser which lacks the power of eminent domain,

to acquire title to a number of adjacent parcels of land to form an assembled tract for the buyer's own use. There are a number of methods to accomplish this, all of them depending on negotiated agreements.

Where only a few parcels are involved, it is not uncommon to make separate agreements with each owner and condition the closing of each on the closing of the others. When there are too many for this method to be feasible, it is not uncommon to negotiate separate options through a nominee or agent for an undisclosed principal without conditioning one upon the others. The options have a cost, of course, but if there be an unreasonable "holdout", the project can be abandoned at the option cost, or else the plan can be modified to go ahead without the "holdout".

Also of interest here is the audited financial statement of CSI as of September 30, 1979, prepared and certified by Touche Ross & Co. (Exh. C to the CSI sale contract).

For the 11 month period involved, it discloses a net loss after depreciation, of $114,119 and an accumulated deficit (negative surplus) of $526,534. For this reason, CSI could not pay dividends, NJSA 14A:7–14(b).

Current assets were $541,328., while current liabilities were $1,087,189., a ratio of 0.5 to 1. Equity capital was $100,000 for the 100 shares issued, while the net equity, after the accumulated deficit of $526,534 was a minus $426,534.

Using the formula called for by the 1975 Stockholders Agreement (ignoring the lack of figures for a 3-year average), the cash flow would be ($114,119) of net loss, plus $603,507 of depreciation and amortization, or $489,338. Nine times cash flow would be $4,404,492., which contrasts with the purchase price of $23,000,000 plus assumption of identified liabilities.

Note C to the financial statement discloses the existence of a revolving credit loan from a Pennsylvania bank, with credit up to $7 million, of which $5.8 million had been borrowed at September 30, 1979 at prime rate plus 2.25%, plus 0.5% for the unused loan commitment. It also discloses that all of the assets of CSI and all of its stock had been pledged as collateral for borrowings. Thus, absent a release of the pledge, plaintiff is presumably not free to sell his stock to a third party, quite aside from the shareholders agreement and quite aside from the relative unmarketability of a minority interest in a close corporation.

This set of background data had to have been known to plaintiff, not only because he is a member of the CSI board and has access to all its books and records, but because he was provided with a copy of the Times contract which includes these exhibits.[3]

CSI holds franchises in 18 municipalities, all in Camden County, Exh. C–17A, while AEI holds franchises in 37, in Camden, Gloucester, Burlington and Ocean Counties, Exh. C–17B. A map of the territories, Exh. C–17C, discloses that AEI franchises adjoin the CSI franchises on the east and south, and also at the northwest corner (City of Camden). The AEI area seems about 4 or more times the CSI area.

Exhibit F to the Times contract itemizes the assets used jointly by CSI and AEI, which include two self-supporting towers, an earth station, five satellite receivers, 4 optical transmitters or receivers, 20 modulators and demodulators for FM and a long list of equipment for VHF and UHF, and studio equipment, test equipment, construction machinery, furniture and fixtures and vehicles. The list runs for 6 pages. The current agreement for sharing facilities, dated May 9, 1979, is Exh. C–16.

This close affiliation of separate corporate entities, each franchised in separate but adjoining areas obviously made it good

3. Plaintiff became a director on February 27, 1976 although no stock was transferred until July 18, 1977. He signed Board resolutions for Revolving Credit Loan Agreements, which included the pledge of all stock as collateral on April 28, 1977, December 5, 1977, July 31, 1978 and participated in a like resolution of March 6, 1980. On the date his uncle transferred 25 shares of stock to him, he signed a letter binding himself to the Stockholder's Agreement of October 5, 1975 and the loan agreement then in effect. See, Minute Book, Exh. C–1.

sense to enter into the equipment sharing agreement so that each could realize economies of scale, provide back-up support for each other, and the like. The same considerations led to the consulting and management agreement with CVC, which dates back to October 7, 1975, Exh. C–15.

Because of these interrelated arrangements, a number of them going back to before plaintiff became a shareholder, an outside buyer would be unlikely to be interested in either CSI or AEI alone. It would be like buying one of a pair of Siamese twins.

In any event, the first 15 counts of the complaint are grounded on claims of fraud, conflict of interest, breach of fiduciary duty, and the like, all premised on the proposition that out of the total sum to be paid by the TIMES for CSI, AEI and the 6-year consulting and non-competition agreement, the amount allocated to CSI is grossly underproportioned, and since plaintiff can only benefit from CSI's contract, he considers himself cheated out of his own fair share.

Defendants moved for dismissal, but since they rely on affidavits and exhibits outside the pleadings, the motion must be treated as one for summary judgment, F.R. Civ.P. 12(b).

Several points were raised, aside from affidavits by all the other officers, directors and shareholders that they acted in the exercise of their own independent business judgment, and the like.

The most important of these points was that for none of the charges or claims in Counts 1 through 15 did plaintiff have a ripened cause of action. The sale might not go through, on any date in the span from March 2 to December 31, 1981, as the contract provides under stated conditions. Absent a closing, plaintiff, it is argued, cannot claim to have sustained any injury.

He does not seek to enjoin the closing pending final judgment, nor could he for failure to join the TIMES as a party. Its presence here would be indispensible. And, in order to secure a preliminary injunction, even if the Times were joined, he would be obliged to post security for damages as mandated by F.R.Civ.P. 65(c). In this case, that security might need to equal the purchase price to be paid by the Times.

He asks but one form of equitable remedy, namely an injunction against distribution by CSI of the proceeds of sale. Since, on a distribution, each shareholder receiving payment is under obligation to repay as though there were a refunding bond, there would be no basis to oblige a defendant, not found bound by a judgment, to provide security in this fashion to assure collection of a claim not reduced to judgment. Since plaintiff's interest is 25% of the whole, the alleged true value of the assets sold would need to be four times the contract price before plaintiff could claim that the recovery by refunding of distributed amounts would be insufficient to pay his claim, if sustained. Nothing in the papers submitted remotely approaches this magnitude of disparity.[4]

Plaintiff also responds that he has already suffered damage (a) because the sale precludes the declaration of dividends due to CSI's need for cash to meet sale conditions; (b) because the making of the contract robbed him of the opportunity to sell his stock to another at a better price than his distributive share; and (c) because he claims punitive damages.

Although later developments make it unnecessary to decide these points at this time, it is noted that the absence of net earnings or surplus precludes any dividend even if the Board were of a mind to declare them, and that the stock has been pledged as collateral for a very large bank loan. As to punitive damages, the New Jersey rule seems to be that there must be a right to compensatory damages, even in the nominal amount of 6 cents or $1., before any punitive damages can arise.

---

**4.** After the February 25th hearing, plaintiff filed an affidavit disclosing, for the first time, the names of the alleged experts he spoke to who expressed the view that the contract price was too low. Their own affidavits were not submitted nor is there any indication of the underlying facts on which each based his alleged opinion.

Count 16 is for a declaratory judgment to ascertain whether or not plaintiff has the rights of dissent, appraisal and payment for his stock. The defense here is that no position whatever has been taken by CSI on the subject and that plaintiff has not taken a specific position. In fact, at the emergency hearing of February 25, 1981, CSI's counsel offered to recognize those rights, whether the proper steps had been taken so far or not, if plaintiff would accept his rights as a dissenting shareholder by noon of the next day. The court has not been informed that there was any acceptance, and would be surprised if there were since the distributive share under the Times contract will very likely exceed what could be recovered by dissent. It is doubtful that declaratory remedies may be used to create a controversy where none exists.[5]

With an ongoing jury trial in progress since February 3, 1981, and aware that a ruling after February 27th might be too late, especially since the court could make no binding construction of the Times contract due to the absence of the Times as a party, materials were gathered in preparation for a ruling, one way or the other, by the 27th, with an opinion articulating reasons to follow.

This schedule was disrupted when plaintiff moved on short notice, on February 25th, for an order to dismiss the complaint under F.R.Civ.P. 41(a)(2).

On February 27th, the court entered an order of dismissal, with prejudice. It set out terms and conditions on which plaintiff may apply to modify the order to a dismissal without prejudice, thereby enabling him to file a second and new complaint after the closing, which the brief indicates he intended to do.

This course was selected for several reasons. The first was that a dismissal with prejudice at this time would be most likely not to be an obstacle to the closing, and thus unlikely to prejudice the Times, a nonparty.

Second, while defendants may well have been entitled to recover attorneys fees, estimated at some $35,000 now, there was insufficient time to have had submitted the highly detailed information, and to perform the complex task, as required by the decisions in this circuit. Accordingly, the terms and conditions established a mechanism for those materials to be gathered and supplied to plaintiff by April 30, 1981, and made it a condition of any application to modify the dismissal to one without prejudice that those expenses be paid. Procedures are established at that time, without the pressures of unavailable time, to resolve any disputes about the amount.

Third, the terms and conditions recognize that under the Times contract certain steps are to be taken after closing. For example, a fresh audited report of CSI is to be prepared as of the closing date. This will obviously take some months to perform. For that reason, the permitted application may not be filed until the post-closing steps have been completed.

Fourth, the terms and conditions protect the plaintiff by assuring that he will have the final facts and figures, as well as the extent of the reimbursement he may be obliged to pay, before making up his mind whether to reassert the claim when it is no longer open to the objection that it is not ripe.

This disposition naturally rendered moot the pending motion for summary judgment, and no disposition is made of it at this time. This opinion does preserve the basic data gathered over many scarce hours, in case the dispute is revived.

One further point deserves mention. The brief for plaintiff presses vigorous argument in a number of places based on derogatory matter about one defendant. Except for the limited use permitted by Fed.Ev. Rule 609, it was clear from the colloquy that this derogatory material was neither

---

5. Plaintiff also argued that he had not had discovery, and that a Magistrate's order of January 26th, based on a ruling early in that month, denied an order to compel depositions.

Plaintiff failed, however, to file an appeal to this court within 10 days of the order, as specified by the General Rules of this District, and so cannot raise the point now.

relevant nor admissible. Since all defense affidavits corroborate each other, the Rule 609 admissibility carries no weight whatever. The argument referred to ought not to have been submitted, and it will be disregarded in any future application as "scandalous and impertinent" matter, as the old cases say.

## APPENDIX

## MEMORANDUM

### February 27, 1981

BIUNNO, District Judge.

This matter came before the court on a motion of defendants returnable February 9, 1981. Since the submissions on both sides included proofs by affidavit outside the pleadings, the motion, however denominated, must be treated as a motion for summary judgment, F.R.Civ.P. 12(b), last sentence.

What promised to be a lengthy criminal jury trial was in progress, and so the court entered a Memorandum Order on February 5, 1981 directing that the matter be heard and decided without oral argument under F.R.Civ.P. 78.

After review of the submissions, the court entered an order on February 19, 1981, directing the appearance of all individuals party to the action, plaintiff and defendant, and the production of a number of books, records and documents, on February 23, 1981 at 2 PM. The plaintiff was not present at the start, but did arrive later after phone call from his attorney. All the individual defendants were present except Gloria Wolosoff who was unable to obtain transportation from Florida within the period involved. At the conclusion of the proceedings, during which the books, records and documents were marked as exhibits and a number of other fact matters clarified, the court reserved decision.

On February 25, 1981, plaintiff's attorneys appeared on short notice, along with defendants' attorneys, to present a motion for voluntary dismissal as authorized by F.R.Civ.P. 41(a)(2) and 23.1, which defendants opposed.

Both sides agreed that plaintiff had proposed a stipulation for voluntary dismissal, without prejudice, on February 24, 1981, which defendants rejected; hence the motion under Rules 41(a)(2) and 23.1. The supporting affidavit of Dennis A. Estis records the proffer and rejection. The memorandum in support of the motion makes explicit that plaintiff intends to commence a second lawsuit once the closing has been had on CSI's sale of assets to the assignee of The New York Times Company.

At the hearing of the motion, defendants made clear that if there were a dismissal, it should be with prejudice, or on terms taking into account, among other relevant matters, the legal expenses to which defendants have been put, estimated at some $35,000 aside from other expenses.

So far as the contract is concerned, the closing with the Times' assignee is scheduled for Monday, March 2, 1981, and nothing by way of fact before the court enables it to conclude that the closing will not be called for that day.

Since the contract of sale and accompanying letter agreement contain provisions under which the pendency of this suit may trigger a right in the buyer to refuse to buy, and since the court cannot adjudicate any such question because the buyer is not joined as a party, a ruling one way or the other is clearly called for by February 27, 1981.

The time demands of the criminal trial, still in progress, make it humanly impossible to prepare a formal opinion or memorandum articulating the reasons for the ruling to be made. All of the papers and submissions on both motions have been completely reviewed and full deliberation had on them and the arguments. The court accordingly has devoted such limited time as was available to the preparation of an order, entered simultaneously herewith, and it reserves to a later date, as soon as feasible, the drafting of an opinion or memorandum thereon. While it does not happen often, the practice is well-established and has been employed by all courts, when nec-

essary, including the Supreme Court of the United States. See, e.g., *Mesarosh v. U. S.*, where a decision to order a new trial was announced from the bench before hearing any argument on the merits. The brief per curiam decision of October 10, 1956 is reported at 352 U.S. 862, 77 S.Ct. 8, 1 L.Ed.2d 72, while the amplified opinion of Chief Justice Warren was handed down November 5, 1956, see 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956).

Another example is *Aaron v. Cooper.* On application in No. 1 Misc., August Special Term, 1958, the court first entered an order setting a schedule of steps, dispensing with various usual procedures, and setting September 11, 1958 for argument. That order is found at 358 U.S. 27, 78 S.Ct. 1397, 3 L.Ed.2d 1.

On September 11, 1958, the Chief Justice reconvened the court in Special Term, and the court denied motions to file briefs, intervene and argue amicus curiae, denied a motion for leave to file suit for declaratory judgment, granted the petition for writ of certiorari, and directed argument to proceed. The text of this ruling is found at 78 S.Ct. 1398, 3 L.Ed.2d 2.

On September 12, 1958, the court entered a ruling per curiam affirming the judgment below. It said: "The expression of the view supporting our judgment will be prepared and announced in due course." Then followed the text of the court's order to be effective immediately. The text of this ruling and order is found at 358 U.S. 5, 78 S.Ct. 1399, 3 L.Ed.2d 3.

The ensuing full opinion, handed down September 29, 1958 by Chief Justice Warren, is found at 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5.

These are ample precedent for the course followed here. Plaintiff's motion to dismiss is granted. The dismissal is with prejudice. Should he wish to file a second suit, he may apply to this court to alter the dismissal to one without prejudice, on terms. Jurisdiction for that purpose is retained "at the foot of the decree." In view of the dismissal, no decision is called for on the motion for summary judgment.

## APPENDIX B

### ORDER

The court having considered all the papers, submissions and arguments in respect to (a) defendants' motion for summary judgment returnable February 9, 1981 as amplified by the proceedings of February 23, 1981 and the exhibits then marked; and (b) plaintiff's motion for dismissal pursuant to Rules 41(a)(2) and 23.1, F.R.Civ.P.; and

It appearing that notice of the proposed dismissal has been given to all shareholders in the manner directed by the court from the bench and recorded in the transcript of February 25, 1981; and

The court having concluded that the motion for dismissal should be granted, with prejudice, and with terms on which plaintiff may apply for an order to modify the dismissal to one without prejudice, pursuant to the Memorandum of even date, the same to be amplified by a formal opinion or memorandum articulating the court's reasons, as there mentioned,

It is, on this 27th day of February, 1981, ORDERED that:

1. The complaint herein is hereby dismissed with prejudice as to all claims asserted therein, or that might have been asserted in accordance with the "single controversy" doctrine, except that the dismissal is without prejudice to any action or proceeding authorized by N.J. Statutes, Title 14A for the enforcement of such rights of dissent, appraisal and payment thereof as plaintiff may have under said statute.

2. Any application by plaintiff to modify this order to provide that the dismissal be without prejudice, shall be made on the following terms.

a. The application shall not be made until after the completion of all steps to finally conclude the closing of the sale of certain assets of defendant Cable Systems Incorporated as such steps may be specified in the closing documents as actually executed, including steps to be taken after the closing date other than those

calling for payment and satisfaction of any notes executed and delivered to reflect the purchase price payable.

b. The application shall be made to this court, and in this cause only.

c. The application shall be accompanied by a deposit with the clerk of this court of an amount sufficient to reimburse the defendants for the expenses incurred by them for attorneys and counsel fees, costs as allowable by law, and travel expenses for attendance at the proceeding of February 23, 1981, as well as for any amounts recoverable pursuant to said Title 14A, and any amounts which a corporate defendant is obliged to pay by way of indemnity to corporate agents as defined in said statute, and for any other amounts authorized by any applicable federal or New Jersey statute or judicial decision.

d. The defendants shall prepare and furnish to the plaintiffs, on or before April 30, 1981, a statement of all amounts asserted to come within the scope of subparagraph c of this paragraph 2, prepared in such fashion as to comply with the applicable decisions of the Court of Appeals for the Third Circuit and of the Supreme Court of New Jersey for the determination of such amounts, including the costs and expenses of preparing said statement. The statement shall be verified under oath or certified pursuant to 28 U.S.C. § 1746. Plaintiff shall be supplied with original and one copy, and defendants shall retain a copy. The statement shall not be filed unless an application is filed by plaintiff, in which event the original shall be filed with the application. Any disagreement in respect to the amount thereof will be heard and decided after said application is filed, provided that plaintiff shall make deposit with the clerk of so much of the amount shown by the statement as he does not dispute, together with the reasons for objection to any amount, item by item.

e. In the event plaintiff shall file such application, defendants may apply to this court for a determination of such amount, by way of interest accrued from the date hereof to the date of deposit, and for an order to deposit the additional amount with the clerk of this court before the merits of the application are heard and decided. Defendants may also apply for a stay of further proceedings on such application until they have been allowed to withdraw and receive unconditional payment of all amounts now or hereafter required to be deposited in connection with such application, all by analogy to the procedures set out in Rule 41(d), F.R. Civ.P.

f. The period of time elapsed from the date hereof, to the date on which an order is entered modifying the dismissal herein to a dismissal without prejudice shall be excluded in respect to any applicable statute of limitations on any now existing claim or claims against any person now a party defendant herein.

3. Jurisdiction is retained for the sole purpose of receiving and acting upon an application by plaintiff under paragraph 2 hereof or as may otherwise be allowed by statute or rule of court.

4. The foregoing provisions hereof have rendered moot the pending motion for summary judgment and it is accordingly denied on that ground and not on the merits.